Rehearing en banc granted by order filed 12/3/96 --
published opinion of 9/19/96 is vacated

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

WILLIAM RUNNEBAUM,
Plaintiff-Appellant,

v.                                                        No. 94-2200

NATIONSBANK OF MARYLAND, N.A.,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-93-3830-S)

Argued: March 10, 1995

Decided: September 19, 1996

Before MURNAGHAN, WILLIAMS, and MICHAEL,
Circuit Judges.

_____

Reversed and remanded by published opinion. Judge Michael wrote
the majority opinion, in which Judge Murnaghan joined. Judge Wil-
liams wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Gerard Patrick Martin, MARTIN, JUNGHANS, SNY-
DER & BERNSTEIN, P.A., Baltimore, Maryland, for Appellant. Eva
Susan Tashjian-Brown, MCGUIRE, WOODS, BATTLE &
BOOTHE, Richmond, Virginia, for Appellee. **ON BRIEF:** Gregg L.
Bernstein, MARTIN, JUNGHANS, SNYDER & BERNSTEIN, P.A.,

Baltimore, Maryland, for Appellant. Donald F. Burke, MCGUIRE, WOODS, BATTLE & BOOTHE, Baltimore, Maryland, for Appellee.

_____

**OPINION**

MICHAEL, Circuit Judge:

William Runnebaum, who is infected with human immunodeficiency virus (HIV), the virus which causes acquired immune deficiency syndrome (AIDS), appeals an order of the district court granting summary judgment in favor of NationsBank of Maryland, N.A. on Runnebaum's claims of discriminatory treatment under the Americans with Disabilities Act (ADA) and the Employee Retirement Income Security Act (ERISA). See 42 U.S.C.§ 12112 et seq.; 29 U.S.C. § 1140 et seq. We reverse and remand for trial because we find that issues of material fact preclude summary judgment.

I.

Because this case comes before us after a grant of summary judgment, we must construe the facts in the light most favorable to the non-moving party, here Runnebaum, and we must draw all justifiable inferences in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Smith v. Virginia Commonwealth University, 84 F.3d 672, 675 (4th Cir. 1996) (en banc); Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1134 & n.3 (4th Cir. 1995). This is because "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249 (quoted in American Metal Forming Corp. v. Pittman, 52 F.3d 504, 507 (4th Cir. 1995)). Read in the light most favorable to Runnebaum, the record discloses the following.

In June 1991 NationsBank in Baltimore hired Runnebaum away from First American Bank, where he had worked in private banking and had been a branch manager. In his first year at NationsBank Runnebaum worked in the private banking department, where he served as marketing coordinator. When NationsBank's Baltimore operation

2

opened a new trust department, Runnebaum applied for a sales position in the new department. Under NationsBank policy Runnebaum could be considered for another position only if he was "performing at a satisfactory level or above in [his] current position." Runnebaum's supervisor in private banking, Michael Kines, recommended Runnebaum for the new job in the trust department. Kines said that Runnebaum had "good skills and is a valuable member of the PB [private banking] team." In particular, Kines said that Runnebaum had "[g]ood calling skills and planning ability" and that he did especially well on "marketing oriented" projects. After a series of interviews Ann Pettit, the trust department supervisor, hired Runnebaum in June 1992. At the same time Pettit hired Clifford Andersson to work in an identical position at NationsBank's Bethesda, Maryland, office. Pettit required both men to sign a "sales goal" letter that set sales targets for the remaining months of 1992. Runnebaum and Andersson also received a "Training Tasks" memorandum from Pettit, dated July 14, 1992 (the "July memorandum").

In August 1992 Runnebaum made his first sale, bringing to the bank $2.55 million in assets to administer. In September Runnebaum made a second sale that brought in nearly $500,000 in assets. In October the bank gave Runnebaum responsibility for planning a reception for lawyers from McGuire, Woods, Battle & Boothe. This was an important marketing event because lawyers (dubbed "external referral sources" by Pettit) at times referred their clients to the bank's trust department. The McGuire, Woods reception went well, and Michael Brown, NationsBank's Baltimore city manager for the trust department, sent Runnebaum a handwritten "note of thanks and congratulations."[1] On November 6, 1992, Pettit gave Runnebaum responsibility for planning and hosting the bank's "Greater Baltimore Holiday Reception," scheduled for December 15. This was a major marketing and customer relations undertaking, on which the bank spent more than $10,000. Formal invitations were sent to clients, prospective clients, and those who could refer clients to the bank. In a memorandum to Baltimore trust and private banking personnel, Pettit described the

_____

[1] Pettit, of course, was Runnebaum's supervisor. Pettit's office, however, was in Tyson's Corner, Virginia, so Runnebaum worked closely with Brown, whose primary responsibility was to "take care of" existing trust business in the Baltimore office.

3

task of planning the reception as "a large commitment for us during an extremely busy time." Indeed, Pettit wanted to "make sure" it was "one of the most successful events we have sponsored."

Sometime between the October 29 note from Brown and the November 6 reception assignment from Pettit, Runnebaum and Pettit had a meeting at which Pettit reduced (for the remainder of 1992) Runnebaum's load of calls on "prospects" (potential clients) and "external referral sources." Petit also mentioned "that there was a lot of jocular behavior going on" in staff meetings, "and she asked [Runnebaum] [ ] to [stop] participat[ing] in it."

Runnebaum was diagnosed with HIV in 1988, but he was asymptomatic at all times relevant to this case. Runnebaum told Brown in September 1992 that he was infected with HIV, and Runnebaum asked if the bank's employee health plan would pay for AIDS medication. Runnebaum asked Brown not to tell bank employees (except for those who administered the health plan) that he was infected. Brown said that he initially panicked when he learned that Runnebaum was HIV-positive.

In November 1992 Runnebaum placed his first order for the prescription drug azidothymidine (AZT), and the bank health plan paid for the drug. AZT is well known to be one method of treating HIV infection and AIDS. Because Runnebaum could not wait at home to receive shipments of the drug, he had them delivered to the bank. Packages containing AZT (and addressed to Runnebaum) were twice inadvertently opened by bank personnel.

On December 9, 1992, Pettit sent Runnebaum a handwritten note reading, "William -- I'm thrilled that you're a part of our group. I look forward to seeing you shine." On December 15, 1992, Runnebaum hosted the bank's holiday reception. He brought his gay lover to the reception and introduced him to Pettit as his "boyfriend."

Five days later, Runnebaum made his third sale, this one involving nearly $2 million in assets. The day before Christmas, Andersson made his only sale of the year, involving $275,000 in assets. At year's end Runnebaum had brought in nearly $5 million in assets. Runnebaum's sales brought in $21,900 in fees to the bank, and Andersson's

4

sales brought in $2,750. Both fee totals fell below the $40,000 target outlined in the sales goal letters.

On January 12, 1993, Pettit summoned Runnebaum to a meeting with Phillip Cawley, NationsBank's personnel manager for the Baltimore/Washington area. Pettit fired Runnebaum at that meeting. According to Runnebaum, being fired

> came as a total surprise. I had no verbal warnings, no written warnings. I was called in and let go and told I would be paid through the end of the month. And it totally blindsided me.

According to Pettit, Runnebaum was fired for failing to complete the assignments listed in the July memorandum and for failing to present a professional image. Andersson was not fired, even though he brought in only one-eighteenth as much business to the bank as did Runnebaum. Pettit said in her deposition that she learned in late November or early December that Runnebaum was infected with HIV, but by then she had already decided to fire him. She claims that Runnebaum's disease played no role in her decision to fire him.

Runnebaum promptly filed an administrative claim with the Equal Employment Opportunity Commission and received a right-to-sue letter. He then filed suit against NationsBank in the United States District Court for the District of Maryland. After discovery the district court granted the bank's motion for summary judgment on the ground that Runnebaum failed to establish a prima facie case under the ADA. The court held in the alternative that Runnebaum did not forecast enough evidence to prove that the bank's asserted rationale for firing him was merely pretextual. The court also granted summary judgment to the bank on the ERISA claim, saying that it decided the ERISA issue "under the same analytical framework as[the] ADA claim." Runnebaum appeals, and we reverse and remand for trial.

II.

Title I of the ADA, 42 U.S.C. § 12112, prohibits discriminatory discharge of "a qualified individual with a disability because of the

5

disability." To prove a violation, a plaintiff must establish (1) that he has a disability, (2) that he is otherwise qualified for the employment, and (3) that he was fired solely on the basis of the disability. Doe v. University of Maryland Medical System Corp., 50 F.3d 1261, 1264-65 (4th Cir. 1995).

A.

Under the ADA,

> The term "disability" means, with respect to an individual --
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The EEOC defines the term "regarded as having [a disability]" to include persons who have "a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment." 29 C.F.R. § 1630.2(a)(2) (emphasis supplied).

Several courts have held that asymptomatic HIV infection is a disability per se. E.g., Gates v. Rowland, 39 F.3d 1439, 1446 (9th Cir. 1994); Abbott v. Bragdon, 912 F. Supp. 580, 585-86 (D. Me. 1995); Doe v. Kohn Nast & Graf, P.C., 862 F. Supp. 1310, 1321 (E.D. Pa. 1994); Support Ministries for Persons With AIDS, Inc. v. Village of Waterford, 808 F. Supp. 120, 132 (N.D.N.Y. 1992); Cain v. Hyatt, 734 F. Supp. 671, 679 (E.D. Pa. 1990); Benjamin R. v. Orkin Exterminating Co., 390 S.E.2d 814, 818 (W. Va. 1990). Several federal agencies have reached the same conclusion. E.g., 29 C.F.R. § 34.2 (Department of Labor); 28 C.F.R. § 35.104 (Department of Justice); 24 C.F.R. Ch. I, Subch. A, App. I (Department of Housing and Urban Development); 34 C.F.R. § 1200.103 (National Council on Disabil-

6

ity); 7 C.F.R. § 15e.103 (Department of Agriculture); 5 C.F.R. § 1636.103 (Federal Retirement Thrift Investment Board); 22 C.F.R. § 1701.103 (Institute of Peace); 45 C.F.R.§ 2301.103 (Arctic Research Commission). We rejected this approach in Ennis v. National Ass'n of Business & Educational Radio, 53 F.3d 55, 59 (4th Cir. 1995), where we concluded that § 12102(2) "requires that a finding of disability be made on an [individualized] basis." More particularly, we said "the statute [ ] contemplates case-by-case determinations of whether a given impairment substantially limits a major life activity, whether an individual has a record of such a substantially limiting impairment, or whether an individual is being perceived as having such a substantially limiting impairment." Id. at 60.

Runnebaum, though asymptomatic, has forecast sufficient evidence here to qualify under 42 U.S.C. § 12102(2)(C), which protects those who are regarded as having a disability. [2] Bank employees knew Runnebaum was HIV-positive and knew he was taking AZT to treat the condition. Upon learning of Runnebaum's condition, a bank supervisor, Michael Brown, felt "panicky" and "uncontrolled" and believed death might be imminent for Runnebaum.[3] This is enough to show at

_____

[2] The dissent says that it is significant and important, see post at 23 & 30, that Runnebaum checked a box indicating that he was not handicapped when he applied for the job in the trust department. This overlooks the fact that the attitudes of others determine whether a person has a disability within the meaning of subsection (C). Moreover, it is settled that an employee may not prospectively waive his right to be protected under the ADA. Alexander v. Gardner-Denver Co. , 415 U.S. 36, 51 (1974); Riley v. Weyerhaeuser Paper Co., 898 F. Supp. 324, 326 (W.D.N.C. 1995), appeal dismissed in part, aff'd in part, 77 F.3d 470 (4th Cir. 1996) (table); H. Rep. No. 485(III), 101st Cong., 2d Sess. 76-77 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 499-500.

[3] The dissent, examining other statements Brown made, says that Brown simply viewed himself as Runnebaum's "protector," which (the dissent argues) does not show that Brown regarded Runnebaum as having a disability. See post at 31. This analysis, however, begs the question. If Brown did not regard Runnebaum as having a disability, why did he regard Runnebaum as needing his protection? Brown's reaction shows his firm belief that bank officials and employees would respond negatively to the news that Runnebaum was infected.

7

the summary judgment stage that the bank perceived Runnebaum as having an impairment that substantially limits a major life activity.

B.

The bank does not contest the second Doe element, that Runnebaum was otherwise qualified for his employment, but argues that Runnebaum has not met his burden with respect to the third element, causation. When a plaintiff seeks to prove causation by means of circumstantial evidence, as Runnebaum does here, the familiar McDonnell Douglas method is applied. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (Title VII case); Ennis, 53 F.3d at 57-58 (ADA case; McDonnell Douglas applied). Runnebaum has come forward with no direct evidence that he was fired solely on the basis of his disability, but the circumstantial case he has forecast is sufficient to avoid summary judgment.

1.

The plaintiff first must establish a prima facie case of discrimination. A prima facie case under the ADA is established if the plaintiff proves that he is in the class protected by the Act and: (1) he was fired or demoted when (2) performing his job at a level which met his employer's legitimate expectations and (3) his discharge occurred under circumstances indicating "that it is more likely than not that the adverse employment action was the product of discrimination." Ennis, 53 F.3d at 58. The plaintiff's burden of establishing a prima facie case is merely a threshold burden and "is not onerous." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

The bank argues that Runnebaum has not established a prima facie case because he was not performing his job at a level meeting the bank's legitimate expectations. We believe that Runnebaum has forecast sufficient evidence to permit a jury to find that he was indeed performing at an adequate level.

A performance review completed by the bank's private banking department in March 1992, before Runnebaum transferred to the trust department, rated him on a scale of one to seven. Seven is the highest

8

rating; one is the lowest. A "four" indicates that the employee "consistently meets job requirements." In the six categories completed, Runnebaum received a five, four fours, and a single three. The review therefore showed that Runnebaum "consistently" met his job requirements in five out of six performance categories. Notwithstanding some criticism, the numerical evaluation was amply supported by narrative praise. In the "Sales/Sales Management" category Kines said that Runnebaum was "very diligent at following through on several very trying situations. He maintains his composure as well as the bank's position in difficult circumstances, which provides balance to negotiations." In commenting on the areas of "Personnel Management" and "Leadership Skills," Kines said that Runnebaum, as marketing coordinator, did "an admirable job" in developing "a unique and innovative marketing plan for 1991 . . . . This was an unusual responsibility for a new [officer], but William has the personal skills and apparent confidence to do well in these activities." Finally, Kines said that Runnebaum "has shown great resourcefulness during his tenure at [NationsBank]." Kines' follow-up review (relied upon heavily by the dissent, see post at 21-22 & 34-35) in May 1992 also indicates satisfactory performance overall. Again, despite some criticism, Kines continued to praise Runnebaum for providing "us with a good, strong marketing plan. Coordination has been done tactfully and less heavy-handedly than in the past." Kines said that Runnebaum had made strides in the area of interpersonal skills, "buil[ding] bridges with peers that have enhanced his credibility."

It is, however, Kines' other evaluation in May 1992, when Runnebaum applied for a transfer to the trust department, that shows he was meeting the bank's expectations at that time. Runnebaum could only apply for a transfer if he was "performing at a satisfactory level or above in [his] current position." Kines, as Runnebaum's supervisor in private banking, recommended him for the sales position in trusts. Specifically, Kines told the trust department that Runnebaum had "good skills and is a valuable member of the PB[private banking] team." In recommending Runnebaum for the new job, Kines thus certified that Runnebaum was doing his current job at a satisfactory level or above.

Runnebaum's supervisors continued to praise him after he began working in the trust department. Brown, NationsBank's senior trust

9

officer in Baltimore, sent Runnebaum a handwritten "note of thanks and congratulations" on October 29, 1992, for planning the bank's reception for a major client referral source, a law firm. A jury could reasonably conclude on the basis of this note that bank officials valued Runnebaum's ability to plan successful social events that helped develop and maintain good relationships with referral sources and made them feel confident about steering potential clients to the bank.

A little more than a month after the successful reception, Pettit, Runnebaum's immediate supervisor, wrote that she was "thrilled" to have Runnebaum in her group and looked forward to seeing him "shine." And, in apparent recognition of Runnebaum's success with the prior event, Pettit assigned him the important job of planning the bank's "Greater Baltimore Holiday Reception." Four hundred of the bank's most important clients, most desired potential clients, and most significant "centers of influence" for business referrals were invited. The bank spent more than $10,000 on the event, which was held at the Center Club of Baltimore. Pettit personally asked Runnebaum to plan all aspects of the event, and she testified that "any function you plan correctly for clients takes effort." In a three-page memorandum to bank managers, Pettit described the reception as "a large commitment for us at an extremely busy time." To encourage other managers to get involved in the advance work, Pettit said that Runnebaum and she would put $1 million in "Sweat equity" into planning the event. Pettit's goal, as she said in the memorandum, was to make the reception "one of the most successful events we have sponsored."**4**

Even with the time Runnebaum spent to ensure that the event was successful, he still outsold Andersson 18 to 1. Indeed, just a few days

_____

**4** Although the dissent tries to belittle Runnebaum by saying that he got too involved in the "minutiae" and "inconsequentia" of the reception, see post at 33 & 25-26, it was Pettit herself, in her memorandum to bank managers, who emphasized the importance of seeing to every last detail. To dismiss Runnebaum's attention to detail as "squandered" time is to misread completely what Pettit expected of him on this project. Indeed, even if Pettit had not been so detailed in her instructions, it would have been irresponsible of Runnebaum to oversee a $10,000 marketing event and not to pay close attention to the particulars of making it successful.

10

after the reception (which went well), Runnebaum made a $2 million sale. Andersson, on the other hand, had not yet brought in a single dollar in sales. Andersson did not make his only sale of the year (for $275,000) until a few days later.

A jury could reasonably infer that Runnebaum met the bank's legitimate expectations.

2.

Once the prima facie case has been established, the employer must then advance some legitimate, nondiscriminatory reason for the adverse employment action.

The bank principally relies on a "Memo to Personnel File" ("the Pettit/Cawley memo") dated January 7, 1993, that Pettit drafted with the assistance of the personnel manager, Cawley. **5** The Pettit/Cawley

_____

**5** The dissent relies heavily on Runnebaum's behavior when he worked in the private banking department. See post at 21-23. The Pettit/Cawley memo does not suggest that Runnebaum's performance in private banking justifies his discharge from his job in the trust department. The dissent puts far too much weight on negative events that occurred early in Runnebaum's tenure in private banking, even though those events are, by the dissent's later admission, "too temporally remote" to be taken seriously. See id. at 33. As we have said, according to the bank's own policy, Runnebaum could not have been hired by the trust department if his performance in private banking was not "at a satisfactory level or above." Runnebaum's private banking supervisor, Michael Kines, was on the whole pleased with Runnebaum's performance. Although Kines recognized that Runnebaum was not without weaknesses, he noted that Runnebaum "has shown a willingness to take action and develop in the right direction." Considering everything, Kines believed that Runnebaum's strengths justified his promotion to trusts.

The dissent also faults Runnebaum for spending "a great deal of time to advancing his acting career." See post at 26. The record reveals that most of Runnebaum's efforts in the acting arena took place while he worked in private banking and that his boss (Kines) encouraged those efforts. Kines viewed Runnebaum's theatrical work as a creative way to get involved in the community, to improve the bank's image, and to

11

memo says that Runnebaum was fired primarily for (1) failing to complete all of the "training tasks" Pettit outlined in the July memorandum and (2) failing to present a professional image inside and outside the bank. These assertions constitute legitimate, nondiscriminatory explanations for the bank's action and satisfy the bank's burden of production.[6]

3.

Even though the bank met its burden of production under step two of the <u>McDonnell Douglas</u> analysis, Runnebaum still has come forward at step three with sufficient evidence to survive summary judgment.

To prevail ultimately at trial, Runnebaum must prove (1) that the bank's explanation is pretextual and (2) that the bank intentionally discriminated against him because of his disability. <u>See St. Mary's Honor Ctr. v. Hicks</u>, 113 S.Ct. 2742, 2748-49 (1993). When this final burden of persuasion is factored into the summary judgment analysis, it means that a plaintiff is required to forecast evidence showing a genuine issue of material fact on the ultimate question of pretext and discrimination. <u>Mitchell v. Data General Corp.</u>, 12 F.3d 1310, 1316 (4th Cir. 1993); <u>see also Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1308-10 (2d Cir. 1995); <u>Collier v. Budd Co.</u>, 66 F.3d 886, 892 (7th Cir. 1995); <u>Waldron v. SL Indus., Inc.</u>, 56 F.3d 491, 492-93 (3d Cir.

_____

develop contacts with potential clients. Kines, for example, encouraged the entire private banking staff to attend Runnebaum's performance as Tom Joad in <u>Grapes of Wrath</u>. Indeed, Runnebaum testified that "numerous clients" attended his performances and that he got business referrals as a result of his avocation as an actor. Finally, Kines himself occasionally sang opera and was a member of various church choirs and the opera guild. At no time did anyone at the bank tell Runnebaum that his extracurricular activities were unacceptable; indeed, it appears that those activities were encouraged.

[6] As we discuss below, however, Runnebaum offers specific evidence to challenge the credibility of the bank's asserted rationale for terminating him and to demonstrate that the justification asserted was merely a pretext for discrimination.

12

1995); <u>Torre v. Casio, Inc.</u>, 42 F.3d 825, 829-30 (3d Cir. 1994); <u>Durham v. Xerox Corp.</u>, 18 F.3d 836, 839-40 (10th Cir.), <u>cert</u>. <u>denied</u>, 115 S. Ct. 80 (1994); <u>Washington v. Garrett</u>, 10 F.3d 1421, 1433 (9th Cir. 1994); <u>Hairston v. Gainesville Sun Publishing Co.</u>, 9 F.3d 913, 921 (11th Cir. 1994); <u>Developments in the Law--Employment Discrimination</u>, 109 Harv. L. Rev. 1568, 1599-1601 (1996).

Because an employer's true motive for firing an employee may be difficult to determine, and because the facts indicating that motive vary widely from case to case, a plaintiff is not required to show pretext and discrimination by any particular kind of evidence at the summary judgment stage, so long as there is some evidence in the summary judgment record showing that he could prevail at trial. <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 187-88 (1989). Runnebaum has met his burden, and the district court erred in granting the bank summary judgment.

Runnebaum could rely on the following facts to convince a rational trier of fact that the bank's asserted justifications are pretextual and that Runnebaum was discriminated against because he was regarded as having a disability. We do not hold that any one fact alone would preclude summary judgment. Taken together, however, they demonstrate the existence of a genuine issue of material fact on the ultimate question of pretext and discrimination.

a.

Runnebaum's and the bank's respective versions of the facts leading up to his discharge are in stark contrast. Runnebaum has forecast specific evidence that would allow a reasonable finder of fact to disbelieve the bank's version of events and to find the bank's witnesses not credible.

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will

13

> permit the trier of fact to infer the ultimate fact of intentional discrimination.

St. Mary's Honor Ctr., 113 S. Ct. at 2749 (emphasis in original).

The main charge against Runnebaum in the Pettit/Cawley memo is that he failed to attend a sufficient number of "prospect" sales calls. According to the dissent, see post at 32-33, this shows Runnebaum's "utter failure to attend to his assigned duties." But a careful look at the summary judgment record belies this claim. When the record is viewed in the light most favorable to Runnebaum, it is evident that Pettit denied him prospect call credit he should have been granted. Runnebaum was denied credit for all nine such calls he made with Brown on the ground that Brown was not officially a sales officer, even though Pettit admitted that Brown was "expected to be interested in sales" as the trust department's Baltimore city manager. Runnebaum also was denied credit for a prospect call he made with Sara Tapiero, a portfolio manager, and for eight calls he made alone. Ironically, Runnebaum was not given any sales call credit for the three calls he made that resulted in actual sales . Andersson, by contrast, who was not HIV-positive and who was not fired, was given credit for calls he made with Brown and Tapiero, as well as for four calls he made alone.

The Pettit/Cawley memo also charges Runnebaum with failing to make a sufficient number of "external referral source" calls, meetings with people (such as lawyers and accountants) who could potentially refer business to the bank. Runnebaum made twelve external referral source calls. But again, Runnebaum was denied credit for nine of ten such calls he made with Brown and for one call he made alone.

Runnebaum also creates a factual dispute about the legitimacy of other reasons assigned for his discharge in the Pettit/Cawley memo. For example, he was faulted for attending no Baltimore Estate Planning Council meetings. However, Runnebaum joined the council (along with Brown), but no meetings were scheduled between the time he joined and the time he was fired. Similarly, Runnebaum was faulted for failing to send Pettit blind carbon copies of his correspondence. But all correspondence on Runnebaum's matters went out over

14

Brown's signature, and Runnebaum "feel[s] certain" he told Pettit about this arrangement.

Another contention of the bank is that Runnebaum did not always make a timely submission of activity and call reports to Pettit. Andersson, however, had the same deficiency. According to Pettit, "both of them had slacked off." Although she put nothing in either's personnel file, Pettit counseled both men. The conduct of both men in the reporting area then improved. Nevertheless, this earlier short-coming was used as a reason to fire Runnebaum, while Andersson, who had the same "failure to attend to his assigned duties," see post at 32-33, was not fired.

In response to the charge that he failed to present a professional image, Runnebaum contends that the bank now overstates the significance of the incidents cited. Runnebaum's joking around, for example, seems to have been common behavior for many members of the Baltimore office. According to Runnebaum, internal meetings "got out of hand from time to time with all members of the sales staff," primarily because the bank's salespeople were "highly energized" and prone to "a lot of horseplay." Similarly, Pettit wrote off the "inappropriate behavior" Runnebaum allegedly engaged in at a presentation to a law firm shortly after joining the trust department, see post at 24-25, to his inexperience. According to Brown, Pettit simply said "he is young," and "he has got to learn it is okay not to say anything." Moreover, the bank has not explained why Runnebaum was allowed (near the end of his tenure) to be co-host with Pettit of the holiday reception, to which 400 clients, potential clients, and "referral sources" were invited, if his behavior could not be trusted. Thus, Runnebaum claims that his behavior did not seriously trouble the bank until it learned he was infected with HIV and needed an after-the-fact rationalization to fire him.

The Pettit/Cawley memo's questionable reliability, then, weighs against summary judgment. Runnebaum's evidence, if believed at trial, supports reasonable "disbelief of the reasons put forward by the defendant" and "rejection of the defendant's proffered reasons," which would permit a reasonable finder of fact to "infer the ultimate fact of intentional discrimination." St. Mary's Honor Ctr., 113 S. Ct. at 2749.

15

b.

The timing of Runnebaum's termination also raises a sufficient question of pretext and discrimination to weigh against summary judgment. See EEOC v. Ackerman, Hood & McQueen, Inc., 956 F.2d 944, 949 (10th Cir.), cert. denied, 506 U.S. 817 (1992). Runnebaum was given additional marketing responsibilities relatively early in his tenure with the trust department, and he even received a note of praise from his supervisor, Pettit. Just a short time later, though, Runnebaum was fired. The record thus presents an unresolved material question: what caused the bank's attitude toward Runnebaum to change so suddenly.

Runnebaum argues that the change came with Pettit's discovery that Runnebaum was HIV-positive or with her learning that he was receiving medication to treat his condition. The bank claims, however, that Pettit had already made the decision to fire Runnebaum before she learned of his disability and that the bank employees who opened Runnebaum's medicine packages never told Pettit that Runnebaum was taking AZT. Whether Pettit resolved to fire Runnebaum before or after she learned he was HIV-positive and whether she knew Runnebaum was taking AZT, however, are questions of fact that must be resolved at trial. More particularly, these questions center on Pettit's credibility, and questions of witness credibility must be left to the trier of fact. Tuck v. Henkel Corp., 973 F.2d 371, 376 (4th Cir. 1992), cert. denied, 507 U.S. 918 (1993); see also Beardsley v. Webb, 30 F.3d 524, 530 (4th Cir. 1994); Gray v. Spillman, 925 F.2d 90, 95 (4th Cir. 1991).

Pettit's inconsistent behavior supports a finding of discriminatory intent. Pettit claims she decided to fire Runnebaum sometime in November 1992, but she never warned him that he was in danger of losing his job. Furthermore, on December 9 she praised him, sending him a handwritten note reading, "William -- I'm thrilled that you're a part of our group. I look forward to seeing you shine." This cuts against the bank because bosses generally do not praise employees they have decided to sack. Pettit's conduct sheds doubt on her claim

16

that she resolved to fire Runnebaum before she learned he was infected with HIV.**7**

Finally, we mention again that Pettit trusted Runnebaum to plan and host the most important bank social event of the year. Would a reasonable bank official budget $10,000 for her most important marketing event of the year, only to entrust the event's planning and execution to a person who posed a risk of alienating those who would attend? The answer is obvious and suggests that a reasonable finder of fact could disbelieve the bank's asserted rationale for terminating Runnebaum.

From the foregoing, a jury could find that Pettit decided to fire Runnebaum after she sent him the December 9 note and soon after she learned that he was HIV-positive. This finding would support Runnebaum's claim that the bank discriminated against him solely because he was infected with the AIDS virus.

c.

Brown's reaction upon learning that Runnebaum was infected with HIV could also lend support for a finding of pretext and discrimination.

_____

**7** The dissent, see post at 36, fails to recognize the importance timing plays in this case. The dissent says that the December 9 note "is cast in anticipation of future achievements," "speaks in terms of future hope," and "merely . . . hop[es] for a profitable future" for Runnebaum. Id. (emphasis in original). Pettit claims, however, that she sent the note a month after she had "resolved conclusively to discharge Runnebaum." Id. at 25. The dissent fails to explain this glaring inconsistency between Pettit's purported intent and her undisputed conduct. If Pettit had conclusively resolved to fire Runnebaum before she sent the note, what "profitable future" did she foresee for him? The finder of fact could conclude that Pettit's claim that she resolved to fire Runnebaum before she learned he was infected with HIV lacks the ring of truth. Thus, the question of Pettit's credibility is squarely in issue and militates against summary judgment. See St. Mary's Honor Ctr., 113 S. Ct. at 2749; Mitchell, 12 F.3d at 1316.

17

Many disabilities are apparent to a casual observer. An employer can see a wheelchair, a guide dog, or a hearing aid. Other disabilities, however, are invisible to the naked eye. Runnebaum's alleged disability, being HIV-positive, falls into the latter category. When a disability is not readily apparent, an employer's reaction upon learning of the disability can be relevant to a finding of discrimination. Specifically, an employer's immediate reaction often can provide insight into his motives for later firing a disabled employee. **8**

When Brown learned that Runnebaum was HIV-positive, he immediately felt

> panic, panic because I was thinking how am I going to work, you know, and be a friend to somebody who is HIV positive. I've educated myself a lot since then. But, you know, suppose he dies on me. Should I tell Ann[Pettit] at this point, should I tell the bank? I remember feeling panicky, uncontrolled.

(Emphasis supplied.)

The finder of fact could view this statement as evidence that Pettit learned from Brown that Runnebaum was HIV-positive before she decided to fire him. This evidence also lends support for a finding that Runnebaum was not fired because of poor performance, but because

_____

**8** Our analysis of this issue is guided by cases interpreting the Pregnancy Discrimination Act of 1978. See Lempres v. CBS Inc., 916 F. Supp. 15, 23 n.37 (D.D.C. 1996) (Pregnancy Discrimination Act plaintiff must meet requirements similar to those imposed on ADA plaintiffs). Pregnancy is not observable at first. Yet an employer's reaction upon learning that an employee is pregnant can be relevant in proving that he later fired her with discriminatory intent. EEOC v. Ackerman, Hood & McQueen, Inc., 758 F. Supp. 1440, 1453 (W.D. Okla. 1991), aff'd, 956 F.2d 949 (10th Cir.), cert. denied, 113 S. Ct. 60 (1992); accord Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1485 & 1491-92 (10th Cir. 1994); Thompson v. La Petite Academy, Inc., 838 F. Supp. 1474, 1477-78 (D. Kan. 1993); cf. McDonnell Douglas, 411 U.S. at 804 (employer's "reaction, if any" upon learning of plaintiff's civil rights activities is relevant to show pretext).

supervisors at the bank panicked at the thought of having an AIDS patient on the payroll.**9**

d.

Runnebaum has also come forward with comparative evidence in support of his claim of pretext. "Comparative evidence is that which shows employees who were not members of the protected class were treated differently." Reeves v. Thigpen, 879 F. Supp. 1153, 1176 (M.D. Ala. 1995). A plaintiff may use comparative evidence to show the existence of a genuine issue of material fact on the question of pretext and thereby defeat a defense summary judgment motion. Id. at 1175-76; see also Alvarado v. Bd. of Trustees of Montgomery Community College, 928 F.2d 118, 122 (4th Cir. 1991) (affirming judgment, after bench trial, on basis of comparative evidence).

Runnebaum outsold Andersson (who was not regarded as having a disability) by a factor of 18 ($5 million to $275,000), but Andersson was not fired even though Andersson and Runnebaum were hired at the same time and were given identical sales goals. Brown testified that the key goal of salesmen like Runnebaum and Andersson was "to bring in new business." In addition, another bank employee, David Kutch, said that Runnebaum, like Andersson, was "there to produce volume." Finally, the record does not disclose that Andersson spent large amounts of time (as did Runnebaum) organizing important marketing events at the bank's request. We recognize that Runnebaum may have had shortcomings, as the bank claims, justifying his firing. But given the bank's overriding emphasis on sales, a question is

_____

**9** Improperly reading Brown's statement in the light most favorable to the bank, the dissent claims that it proves Brown's lack of discriminatory motive toward Runnebaum and that Brown's motive always was to be Runnebaum's "protector." See post at 39. Yet Brown admitted in his deposition that there was occasionally bad blood between him and Runnebaum, that sometimes their discussions had been "combative or argumentative," and that Runnebaum believed Brown had a "vendetta" against him. Because on summary judgment all facts and reasonable inferences must be construed in the light most favorable to the non-moving party, the finder of fact must be allowed to determine at trial the true nature of the relationship between Runnebaum and Brown.

raised when the salesman who was fired brought in 18 times as much business as the salesman who was not fired. Moreover, as we discussed above, Pettit was much more lenient with Andersson on granting credit for sales calls and on excusing his tardiness in turning in activity and call reports. A jury could reasonably see these inconsistencies as evidence of pretext and discrimination. **10**

## III.

The dissent's criticisms largely boil down to a factual attack. And while the dissent does a good job of arguing that the facts may reasonably be read in the bank's favor, that argument is not enough to establish the bank's right to summary judgment. Although a factfinder could reasonably choose to believe the bank, the same factfinder could also reasonably determine on the basis of the record before us that the bank's explanation for firing Runnebaum is not worthy of credence and that discrimination was the true motivation for his termination.

In sum, Runnebaum has forecast evidence of all the elements of a prima facie case and evidence to support a finding of pretext and discrimination. Runnebaum's ADA claim must survive summary judgment because there is a genuine issue of material fact as to whether he was fired because he was regarded as having a disability.**11** We reverse and remand for trial.

REVERSED AND REMANDED

_____

**10** The bank currently employs other HIV-infected persons. The bank may not, however, be granted summary judgment simply because it has a few employees within the protected class. See O'Connor v. Consolidated Coin Caterers Corp., 116 S. Ct. 1307 (1996); Carson v. Bethlehem Steel Corp., 82 F.3d 157, 158-59 (7th Cir. 1996).

**11** Because the district court granted summary judgment on Runnebaum's ERISA claim for precisely the same reasons summary judgment was granted on the ADA claim, and because the relevant elements of the prima facie case are the same, see Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 239 (4th Cir. 1991), Runnebaum's ERISA claim must survive as well.

20

WILLIAMS, Circuit Judge, dissenting:

The majority holds that Runnebaum not only succeeded in establishing a prima facie case of discrimination under the ADA and ERISA, but also demonstrated sufficiently to survive summary judgment, that NationsBank's reasons for discharging him were pretextual. Concluding that the majority's holdings cannot be squared with the facts of this case or the law of this circuit, I cannot subscribe to either holding. The undisputed, material facts establish that Runnebaum cannot prove a prima facie case of discrimination. Even assuming that Runnebaum established a prima facie case, I would hold that NationsBank's articulated reasons for his discharge were not pretextual as a matter of law. Accordingly, I dissent.

I.

I recite the facts that the majority necessarily ignores in order to reach its conclusions. While the parties do not dispute that Runnebaum, when he so chose, performed well, he failed to perform well consistently; and just as consistently, he engaged in conduct that justified his termination from employment. Moreover, even stellar performance in some areas cannot overcome an overarching failure to fulfill professional responsibilities. In my view, the majority loses sight of these two precepts.

NationsBank hired Runnebaum in May 1991 as an assistant vice president in the private banking division, and from the inception of his brief, nineteen-month stint at NationsBank, Runnebaum experienced difficulty in satisfying his professional responsibilities. In a March 20, 1992, written evaluation of Runnebaum (March Memorandum) -- from which the majority selectively culls sterile numerical ratings to conclude that Runnebaum's performance was satisfactory, see ante at 8-9 -- Department Manager Michael Kines, Runnebaum's first supervisor at NationsBank, detailed Runnebaum's difficulty in meeting NationsBank's standards. For instance, while Kines stated that Runnebaum "demonstrated rudimentary . . . credit analysis techniques," performed "a good job on simple . . . credits," and demonstrated "the personal skills and apparent confidence to do well" in banking, Kines also observed that Runnebaum's "production has been minimal" and that his "[e]ffectiveness was hampered by communica-

21

tion problems, but this could have been corrected with extra effort." (J.A. at 54-55.) Additionally, Kines concluded that Runnebaum was "heavy-handed" in dealing with his peers, and his unorthodox behavior was unpredictable, causing his colleagues and clients to question his credibility. (J.A. at 54-55.) Kines's evaluation also noted that Runnebaum failed to familiarize himself with bank procedures and policy and to see tasks through to completion, finally concluding that "[a]t this point in [Runnebaum's] career, close monitoring by management should never be necessary." (J.A. at 55.) Thus, in his first evaluation by NationsBank, Runnebaum was apprised that his employer was less than fully satisfied with his performance.

Two months later, on May 18, 1992, Kines again evaluated Runnebaum, reiterating many of his past criticisms. Kines observed that Runnebaum had progressed regarding his personnel management, interpersonal skills, and completion of duties, specifically recognizing that Runnebaum orchestrated a successful marketing plan for a corporate client. Equally, however, Kines reasoned that because Runnebaum maintained so few clients, there was no reason not to handle their needs meticulously. While acknowledging Runnebaum's successes, Kines also noted his failures. For instance, in the "Negative events" category, Runnebaum was censured for "[m]anicky behavior in meetings," "[c]redibility of out-of-office time," two botched loans, and a complaint lodged against him. (J.A. at 97.) In the category described as "Jury Still Out" events, Runnebaum's "[d]evelopment of new business and credible leads" and "[d]ay-to-day productivity" were questioned. (J.A. at 97.) With respect to Runnebaum's credit management, Kines expressed dismay over business development and timeliness in completing duties, noting that "no significant credits have been presented, either for preliminary discussion or approval," "[t]ime is fleeting on meeting personal and unit goals," and "[d]elays in credits, such as those [concerning the two botched loans] will not be tolerated." (J.A. at 97-98.) With respect to Runnebaum's interpersonal skills, Kines noted that Runnebaum must check nervous behavior and the tendency to blame others for mishaps. The majority's mischaracterization of this evaluation as "continued praise" for Runnebaum's performance is simply wrong. See ante at 9. This evaluation specifically cites five failures, two undecideds, and one positive aspect of Runnebaum's performance. A fair reading of this evaluation

22

establishes beyond cavil that Runnebaum's performance was not laudatory.

Runnebaum's professional and personal conduct continued to decline. Michael Brown, NationsBank's Senior Managing Officer in Baltimore, and David Kutch, another of Runnebaum's supervisors, testified that Runnebaum's professional career was plagued by unexplained absenteeism, tardiness, and lengthy lunch periods. Kutch stated that Runnebaum enjoyed shocking colleagues and clients by recounting racially and sexually offensive jokes at conference meetings. According to Kutch, Runnebaum's forays into dubious humor were "disastrous." (J.A. at 79.) For instance, at a meeting, Runnebaum flippantly speculated about the estate of a client whose mother had recently died and improperly attempted to goad a potential client into allowing NationsBank to handle his financial affairs. Also, on soliciting a client, he impersonated the chairman of another bank, and after executing the charade for a few minutes, identified himself, advising the client -- in scatological terms -- to let NationsBank handle his banking needs. Exhibiting a penchant for acting, Runnebaum enjoyed mimicking persons whose native language was not English, doing so loudly enough to be heard by NationsBank clients, even if the butt of the jest was a NationsBank customer. The majority's attempt to write this conduct off as "jocular" is disingenous at best, particularly when it attributes to Pettit what is actually Runnebaum's view of her criticism. (J.A. at 91.)

Kines and Kutch were not surprisingly relieved by Runnebaum's request to transfer to the Trusts/New Business Development Baltimore Division (Trust Department), which was effective July 8, 1992. A fact ignored by the majority, but of significance to this appeal, is that in completing the paperwork to effectuate his transfer, Runnebaum unequivocally represented that he was <u>not</u> handicapped, thereby signifying that he suffered no disability. Furthermore, Runnebaum <u>never once</u> requested that NationsBank implement accommodations regarding any disability pursuant to the ADA.

Simultaneous with Runnebaum's transfer to the Trust Department in Baltimore, NationsBank also hired Clifford Andersson to perform the same work in its Bethesda, Maryland, office. In connection with their new positions, Ann Pettit, Runnebaum's supervisor in the Trust

23

Department, articulated NationsBank's expectations of Runnebaum and Andersson in a memorandum dated July 14, 1992 (July Memorandum). According to the July Memorandum, Runnebaum and Andersson were instructed that:

> Each of you should arrange with each sales officer to join them on 3 initial and/or follow-up prospect meetings. (Total of 18 joint prospect calls each)
>
> Each of you should arrange with each sales officer to join them on 2 external referral source calls (Total of 12 joint external referral source calls)
>
> Note: For [these items], these should be the sales officer's prospects or referral sources in order for you to observe their interactions, style and sales skills.
>
> You should not go on any prospect or referral source calls on your own at this time. If you do, you must include either another sales officer, me or, in [Runnebaum's] case, Mike Brown. These calls will be in addition to the requirements listed [above]. At the end of September, we will review to determine your progress.

(J.A. at 106-07.) (emphasis added). That Runnebaum failed to comply with the July Memorandum is not disputed. In the memorandum memorializing Runnebaum's discharge dated January 7, 1993 (January Memorandum), Pettit observed that Runnebaum: (1) completed only one of the eighteen required joint sales calls; when this number later was reduced to five, he completed none;[1] (2) completed only two of the twelve required joint external referral source calls; (3) failed to attend any of the required Baltimore Estate Planning Council functions; (4) failed to submit required call reports, which were necessary in order for NationsBank to determine whether there was follow-up with the customer; (5) failed to take suggested training classes or attend manager's meetings; and (6) failed to comport himself professionally.

_____

[1] Indeed, during his deposition Runnebaum testified that he had not intended to make these required sales calls.

In addition to failing in his duties, Runnebaum continued to engage in inappropriate behavior. In two presentations to two separate law firms whose business NationsBank was courting, Runnebaum presented the trust and estate information in a condescending manner to attorneys who were skilled in that area of the law. Additionally, Runnebaum provided to one law firm a trust and estate manual prepared by another law firm, and in doing so, implied that the recipient of this manual would not otherwise comprehend trust and estate law. At yet another meeting with a major client, NationsBank officers were "committed that [Runnebaum] not be there, because they were afraid of what he might say or do." (J.A. at 549.) Brown cautioned Runnebaum regarding this unprofessional conduct. In addition, Pettit found Runnebaum's joking "inappropriate." (J.A. at 79.) Even Runnebaum admitted in his own sworn testimony that Pettit counseled him twice concerning his unprofessional conduct at meetings. The record belies, therefore, Runnebaum's bald assertions that he was not apprised of NationsBank's dissatisfaction with his employment performance and that there was no record of his deficient performance.

Not surprisingly, NationsBank decided to terminate Runnebaum. Indeed, while counseling Runnebaum on November 3, 1992, concerning his untoward conduct and dereliction in meeting sales goals, Pettit decided Runnebaum would not be able to complete his assigned activities and should be discharged. Despite Pettit's decision to terminate Runnebaum, Pettit decided to give him an opportunity to redeem himself. Accordingly, Pettit reduced his sales goals and attempted to inspire him to satisfy them by writing him a note dated December 9, 1992, stating "I'm thrilled that you're a part of our group. I look forward to seeing you shine." (J.A. at 431.) Lesser goals and inspiration were for naught. Pettit resolved conclusively to discharge Runnebaum, stating that she reached this decision November 3, 1992.

While many considerations entered the calculus to discharge Runnebaum, Pettit focused on the fact that he had failed to meet his sales goals, despite the fact that his goals had been reduced in the illusory hope that Runnebaum might be able to satisfy them, as well as failed to perform required duties and exhibit proper decorum. In addition, Runnebaum wasted inordinate amounts of time planning NationsBank's Christmas party. While undeniably NationsBank asked Runnebaum to plan this affair, equally so, NationsBank did not sanction

25

the time he squandered on making these plans. By his own admission, Runnebaum testified in his deposition that "[o]verall, I know I spent several hours each day dealing with details leading up to that party from approximately the beginning or to the end of November to the December 15th date." (J.A. at 92.) (emphasis added). Despite employing an administrative assistant to handle the trivialities of planning the Christmas party, Runnebaum abjured his professional responsibilities to attend to such trifles as

> designing the invitations, compiling a guess [sic] list, wrapping host gifts, ordering handmade truffles, preparing the menu items, preparing the name tags, procuring supplies needed for the event, procuring a pianist, renting a piano . . . .

(J.A. at 93.) Notwithstanding that his sales goals were reduced and he was counseled twice immediately prior to the Christmas party to conduct himself professionally, Runnebaum spent hours each day immersing himself in this inconsequentia, and he took the opportunity to introduce his homosexual partner to colleagues and clients at the Christmas party. Runnebaum also devoted a great deal of time to advancing his acting career and his own corporation, Wilmarc Productions, while ostensibly working for NationsBank, and wrote numerous personal letters and invitations on company time and with company equipment. The majority attempts to characterize NationsBank as condoning this conduct by noting that Kines encouraged NationsBank employees to attend Runnebaum's performance in Grapes of Wrath. See ante at 11-12 n.5. There is no evidence, however, that Kines encouraged Runnebaum to advance his acting career on NationsBank time and utilizing NationsBank equipment. While Kines may have encouraged Runnebaum's acting pursuits, Kines did not encourage such conduct at NationsBank's expense.

Pettit catalogued Runnebaum's unacceptable performance and memorialized her decision to terminate Runnebaum in the January Memorandum, but failed to record this memorandum in his personnel file. On January 12, 1993, Runnebaum, Pettit, and Philip Cawley, Personnel Manager for NationsBank, convened to effectuate the termination, and as of that date, Runnebaum ceased to be employed by NationsBank.

26

Runnebaum filed suit against NationsBank, bringing two claims. First, he claimed that he was terminated in violation of the ADA because he is HIV-positive, contending that this affliction renders him disabled.[2] Second, he alleged that his termination violated ERISA by preventing him from receiving payments for his AZT treatment. Concluding that Runnebaum failed to establish a prima facie case under either the ADA or ERISA, and even if he had, he failed to prove NationsBank's articulated reasons for his discharge were pretextual, the district court granted NationsBank's motion for summary judgment.

II.

Federal Rule of Civil Procedure 56(c) squarely places on Runnebaum the burden to proffer competent evidence of each element of his claim following NationsBank's well-supported motion for summary judgment based on Runnebaum's failure to establish a prima facie case, and alternatively, his failure to prove NationsBank's articulated reasons for his discharge were pretextual. The language of Rule 56(c) is compulsory, mandating that the district court enter judgment against Runnebaum if, "after adequate time for discovery . . . [he] fails to make a showing sufficient to establish the existence of an element essential [of his] case, and on which[he] will bear the burden of proof at trial." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Prevailing on its motion for summary judgment, NationsBank demonstrated to the district court that: (1) there was no genuine issue with respect to any material fact; and (2) it was entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986). In determining whether a genuine issue of material fact has been raised, we must construe all reasonable inferences in favor of Runnebaum. See id. at 255. Because the onus is on Runnebaum to advance competent evidence establishing each element of his claim, he "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Expounding on this pre-

_____

**2** Runnebaum's complaint may also be read to allege that he was disabled on account of his homosexuality. As the district court correctly noted, the ADA specifically excludes homosexuality as a disability. See 42 U.S.C.A. § 12211(a) (West 1995).

27

cept, Anderson explained that "[t]he mere existence of a scintilla of evidence in support of [Runnebaum's] position will be insufficient; there must be evidence on which the jury could reasonably find for [him]." Anderson, 477 U.S. at 252. Thus, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). To defeat NationsBank's motion for summary judgment, therefore, Runnebaum must demonstrate that specific, material facts exist that give rise to a genuine issue. See Celotex Corp., 477 U.S. at 324.

In my view, the majority has lost sight of these principles in reversing the grant of summary judgment in favor of NationsBank. Rather than adhere to these precepts, the majority has given credence to Runnebaum's speculative support for his contention that a genuine issue of material fact existed regarding the reasons for his discharge. Moreover, the majority holds that Runnebaum advanced sufficient evidence that his discharge was pretextual. Because neither of these holdings can be squared with our jurisprudence regarding summary judgment or discrimination law, I cannot subscribe to the majority opinion. I address first Runnebaum's failure to satisfy the elements of a prima facie case, then his failure to establish that NationsBank's articulated reasons for his discharge were pretextual.

A.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C.A. § 12112(a) (West 1995). To establish a prima facie case under the ADA, Runnebaum must prove that:

> (1) [he] was in the protected class; (2) [he] was discharged;
> (3) at the time of the discharge, [he] was performing [his] job at a level that met [NationsBank's] legitimate expectations; and (4) [his] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

See Ennis, 53 F.3d at 58. The burden of establishing a prima facie case rests with Runnebaum, and if he failed to establish every element of his claim, summary judgment was properly granted in favor of

28

NationsBank. See Tyndall v. National Educ. Ctrs. , 31 F.3d 209, 212 (4th Cir. 1994) (sustaining a grant of summary judgment in favor of an employer in an ADA claim because the plaintiff could not prove that she was qualified for her position). If, however, Runnebaum succeeds in establishing a prima facie case, the burden shifts to Nations-Bank to articulate a legitimate, nondiscriminatory reason for the discharge that supports a finding that unlawful discrimination did not cause the challenged action. See Ennis, 58 F.3d at 58. Provided NationsBank satisfies this burden, "the McDonnell Douglas paradigm of presumption created by establishing a prima facie case `drops from the case,' and `the factual inquiry proceeds to a new level of specificity,'" Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir.) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 n.10, 255 (1981)), cert. denied, 116 S. Ct. 380 (1995), which requires that Runnebaum shoulder "the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination," Burdine, 450 U.S. at 256. The ultimate issue in this suit is whether NationsBank intentionally, unlawfully discriminated against Runnebaum because of any alleged disability, and proving this burden rests with Runnebaum. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 516 (1993). Here, the parties do not dispute that Runnebaum was discharged, so I address the remaining three elements of the prima facie case.

1.

The first element that Runnebaum must satisfy in establishing his prima facie case is that he was in the protected class, specifically, that he was "disabled" under the ADA. Pursuant to the ADA, a "disability" is:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

> (B) a record of such impairment; or

> (C) being regarded as having such an impairment.

29

42 U.S.C.A. § 12102(2) (West 1995). Because the ADA qualifies disability by requiring that it impose a "substantial limitation" respecting a "major life activity," the "impairment must be a significant one," not a trivial impairment. Byrne v. Board of Educ. , 979 F.2d 560, 564 (7th Cir. 1992).

According to Runnebaum, he is disabled for purposes of the ADA because of his HIV-positive status. The majority accepts this assertion, concluding that Runnebaum satisfied this element because he was regarded as being disabled, even though he was asymptomatic, and more importantly, affirmatively represented to NationsBank that he was not handicapped. As support for this holding, the majority relies on the fact that Brown, who was also homosexual, became "panicky" and "uncontrolled" on learning that Runnebaum was seropositive.**3** There is no merit to this consideration. Simply put, the majority has mischaracterized Brown's statement beyond recognition. Runnebaum revealed his seropositivity exclusively to Brown in their capacity as friends under the following circumstances:

> Again, I think that it was like a weekend night or something, and [Runnebaum] was down around the harbor with friends or something, and called me and said, come on down and join us or something like that. . . . I ended up coming down, picking [Runnebaum] up standing on the street. . . . [W]e went to a bar . . . . And my recollection is he just told me.
>
> . . . .
>
> William was sharing with me something that was you know, deep, very personal, known by very few. . . . In fact, his lover, John, didn't even know [he was HIV-positive], he told me. And I can remember just thinking -- I remember being in a state of panic, panic because I was thinking how am I going to work, you know and be a friend to somebody who is HIV[-]positive. . . . But, you know, suppose he dies

_____

**3** Seropositive means "serologically positive; showing positive results on serological examination; showing a high level of antibody." Dorland's Illustrated Medical Dictionary 1511 (28th ed. 1994).

30

> on me. Should I tell [Pettit] at this point, should I tell [NationsBank]? I remember feeling panicky, uncontrolled.
>
> But at the same time[,] I remember thinking I cannot let him think that it bothers me a bit. I felt like that I was there to protect him.

(J.A. at 506-08 (emphasis added).) Brown, therefore, was not "panicky" and "uncontrolled" as a result of his regarding Runnebaum as disabled, but was disheartened on learning that his friend was HIV-positive. Properly considered in context, Brown acted anything but "panicky" and "uncontrolled," as his testimony demonstrates, but which the majority ignores. Far from being aloof or panicked as a result of Runnebaum's seropositivity, Brown was solicitous of Runnebaum and sympathetic to his needs, styling himself as Runnebaum's "protector,"[4] as indeed he was because shortly thereafter, Brown arranged for Runnebaum to receive AZT through Nations-Bank's insurer; this is not the conduct of a "panicky," "uncontrolled" man. Indeed, the fact that Runnebaum chose to confide his seropositivity solely to Brown on personal time demonstrates that Runnebaum considered Brown a confidant, and one does not entrust to a confidant information adverse to one's interests. Even accepting the majority's mischaracterization, that Brown felt "panicky" or "uncontrolled" at the time Runnebaum confided in him is simply insufficient under Celotex and Ennis to create a genuine issue of material fact: here, there is no proof that the "panicky," "uncontrolled" feeling meant that Brown regarded Runnebaum as "disabled," much less disabled as a result of his seropositivity.

More important, there is no indication that Pettit, the relevant decisionmaker regarding Runnebaum's termination, regarded Runnebaum as being disabled. Although Pettit knew that Runnebaum was HIV-

_____

**4** The dissent posits that Brown's styling himself as Runnebaum's "protector" implies that Runnebaum needed protection from NationsBank's alleged discrimination. See ante at 7 n.3. On the contrary, properly read in context, Brown's desire to protect Runnebaum is wholly personal and springs from the desire to console a friend. Also, Brown's use of the term "protection," in no way can be construed as attributing to NationsBank invidious discrimination because of Runnebaum's alleged disability.

31

positive <u>when she discharged him</u>, she did not possess this knowledge <u>when she decided to fire him on November 3, 1992</u>. Pettit's testimony on this point was corroborated by Brown, who stated that he did not disclose his knowledge of Runnebaum's seropositivity until after Pettit informed Brown that she planned to discharge Runnebaum. <u>See Ennis</u>, 53 F.3d at 60 (discussing evidence to support claim that "relevant decisionmakers" knew of an employee's disability). Accordingly, I would conclude that Runnebaum failed to show that he was regarded as having a disability.**5**

2.

Next, in my view even the most cursory review of the undisputed, material facts proves beyond cavil that Runnebaum failed to establish the third element of the prima facie case, that he was meeting NationsBank's legitimate expectations at the time of his discharge. NationsBank does not dispute the fact that Runnebaum enjoyed qualified success, and the record amply supports this conclusion. The rankle, however, arises from the fact that Runnebaum's performance degenerated over his term of employment, and despite his occasional successes, he consistently failed to perform required duties and to amend his unseemly conduct.

The record is replete with indications that Runnebaum did not meet NationsBank's legitimate expectations for his employment. First, Runnebaum failed to satisfy his employment duties as set forth in the July Memorandum. Specifically, Runnebaum completed only one of eighteen required joint sales calls and only two of twelve required

_____

**5** Runnebaum does not appear to assert that he satisfies the first element of the prima facie case by virtue of suffering an actual physical or mental impairment as a result of his seropositivity, nor could he credibly do so. The parties do not dispute that Runnebaum has been asymptomatic since 1988 and suffers no affliction arising from his seropositivity. In fact, Runnebaum's own physician, Dr. Michael Pistole, testified that Runnebaum "had no ill effects from the disease or the medications." (J.A. at 154-55.) Comporting with Dr. Pistole's testimony, Runnebaum has consistently maintained that he endures no impairment that substantially limits a major life activity, thereby proving that he is not disabled under the first prong of the ADA's definition of a disability.

joint external referral source calls. Runnebaum also failed to submit required reports, to attend certain functions, and to take training classes or attend manager's meetings. Runnebaum's utter failure to attend to his assigned duties -- which, significantly, Runnebaum does not contend were unreasonable -- conclusively establishes that he was not meeting NationsBank's expectations for his performance. See Ennis, 53 F.3d at 61-62 (concluding that an ADA plaintiff could not prove that she satisfied her employer's legitimate expectations in part because her work was substandard); Ang v. Procter & Gamble Co., 932 F.2d 540, 548-49 (6th Cir. 1991) (ruling that failure to perform reasonable tasks at an employer's demand constitutes not satisfying legitimate employment expectations); Kephart v. Institute of Gas Tech., 630 F.2d 1217, 1223 (7th Cir. 1980) (per curiam) (holding that if an employee is not doing as he is told to do, then he is not performing his job), cert. denied, 450 U.S. 959 (1981).

Second, during his tenure at NationsBank Runnebaum engaged in a pattern of unprofessional behavior. For example, Runnebaum was frequently tardy or altogether absent without explanation, and bought a pager to use instead of curbing his absenteeism. When he was in the office, he devoted large portions of his time to personal matters and to the minutiae of NationsBank's Christmas party-- the latter consisting of tasks more properly delegated to his administrative assistant. See Ennis, 53 F.3d at 61-62 (holding that tardiness, disruptive conduct, errors in work, and devoting work hours to personal matters indicate a failure to satisfy an employer's legitimate expectations); Ang, 932 F.2d at 549 (holding that devoting work hours to personal pursuits and tardiness comprise failure to meet an employer's legitimate expectations). Moreover, Runnebaum's conduct frequently veered from the merely unprofessional to the grossly inappropriate and offensive. Runnebaum's penchant for racial and sexual slurs and his improper conduct at business meetings and toward NationsBank clients certainly cannot be considered to fall within the scope of NationsBank's legitimate expectations for his employment.

The majority largely ignores these facts, choosing instead to focus on Kines's March Memorandum and the notes from Brown and Pettit. Neither Kines's March Memorandum, nor Brown's nor Pettit's notes can defeat NationsBank's motion for summary judgment. Even disregarding Kines's negative comments in the March Memorandum and

33

focusing exclusively on Runnebaum's accomplishments as does the majority, this evaluation is not dispositive for purposes of a January 12, 1993 termination because it is too temporally remote. See Ennis, 53 F.3d at 61 (noting that an ADA plaintiff initially achieved a "good" performance rating in 1990, but at the time of her termination in 1992, her counsel conceded that her performance was lacking); Anderson v. Stauffer Chem., 965 F.2d 397, 401 (7th Cir. 1992) (holding that a 1984 evaluation, even if given in December 1984, and a merit-based pay raise implemented at the start of 1985 were not relevant to a discharge on May 1, 1985, because the situation had changed significantly in the intervening months). Runnebaum steadily declined in performance, and this decline was duly noted, since inception, by NationsBank supervisors. See Ennis, 53 F.3d at 61 (noting the importance of tracking an employee's deteriorating performance in determining evaluation at time of discharge). Here, the majority relies too heavily on an evaluation that predated the challenged action by nearly nine and one-half months, while ignoring Runnebaum's progressively deteriorating performance. In light of this deterioration, the March Memorandum is temporally too tenuous to reflect Runnebaum's performance at the time of termination.

Not only is the March Memorandum not dispositive of pretext, but the majority does not even consider the document in its entirety. As I explained earlier, see ante at 22, this evaluation concluded that Runnebaum failed to familiarize himself with NationsBank policy and procedure, fulfill marketing goals, and work consistently well with others. The majority focuses on the numerical ratings to the exclusion of these negative written comments, dropping the latter from its summary judgment calculation.

Yet another flaw in focusing on the March Memorandum is the fact that the majority disregards the more pertinent , subsequent evaluations that prove conclusively that Runnebaum was not satisfying NationsBank's legitimate employment expectations. For instance, a scant two months later, Kines reevaluated Runnebaum on May 18, 1992, and while observing that Runnebaum did well in many respects, noted that he continued to exhibit poor performance. Most notably, Runnebaum bungled two loans, failed to present significant credits, delayed unreasonably in completing work, behaved unprofessionally, and blamed others for his own mistakes. Two more months demon-

strated that Runnebaum failed to improve his professional goals, as memorialized in the July Memorandum. The downward spiral continued, for on the heels of the July Memorandum came Pettit's counseling Runnebaum <u>twice</u> about his professional failures and coarse conduct. Planning the Christmas party likewise vividly depicted Runnebaum's inability to concentrate on substantive matters and to comport himself with decorum. Considered against this bulwark of progressively deteriorating evaluations, the March Memorandum becomes makeweight to say the least.

The notes from Brown and Pettit are also of no moment. The handwritten note from Brown dated October 29, 1992, provided in entirety:

> Just a note of thanks and congratulations for your efforts in arranging our social with McGuire Woods.
>
> Please see me about attending a staff meeting.
>
> Thanks--Mike

(J.A. at 432.) Unlike the majority, I can assign no value to this note because it does not address Runnebaum's employment performance, but merely thanks him for planning a party. <u>See Aungst v. Westinghouse Elec. Corp.</u>, 937 F.2d 1216, 1223 (7th Cir. 1991) (explaining that an employer's letter of recommendation did not prove discrimination because it failed to respond to the precise reason for the plaintiff's termination). Indeed, this note is arguably read as telling Runnebaum that he must attend staff meetings. Even if this note could be transmuted into an employment evaluation, it has no probative value because it fails to address Runnebaum's specific duties, such as sales goals and marketing strategies and professional conduct. Succinctly put, Brown's note simply provides no insight into this case, let alone defeats NationsBank's motion for summary judgment.

On December 9, 1992, Pettit wrote a note to Runnebaum stating in its entirety:

> William --
>
> I'm thrilled that you're a part of our group. I look forward to seeing you shine.
>
> Ann

35

(J.A. at 431.) This note is of even lesser probative value than the note from Brown. First, this note does <u>not</u> express satisfaction with Runnebaum's performance, but is cast in <u>anticipation of future achievements</u>. Unlike Brown's note, therefore, this note does not even express thanks for performing some duty. Second, this note is simply not an evaluation, nor does it have the force and effect of an evaluation, but is merely an isolated statement hoping for a profitable future. As such, it lacks probative value because it does not address the reasons for Runnebaum's termination. In my view, this note is insufficient to demonstrate any form of discrimination.

In sum, analyzed separately or collectively, the March Memorandum and the two notes are insufficient to show that Runnebaum's performance met NationsBank's legitimate expectations. At most, the March Memorandum demonstrates that Runnebaum displayed positive and negative performance, while the Brown note expresses thanks for a tangential matter, and the Pettit note speaks in terms of future hope. I therefore conclude that Runnebaum has not established the third element of the prima facie case.

3.

The fourth element that Runnebaum must satisfy to establish a prima facie case is that his termination transpired under circumstances that raise a reasonable inference of unlawful discrimination. For many of the same reasons that Runnebaum failed to establish the first and third elements, I conclude that he fails to establish the fourth element. Runnebaum was discharged for incompetent performance, lack of performance, and gauche conduct. The undisputed facts establish these reasons for his discharge, and Runnebaum attempts to ascribe discrimination to NationsBank's conduct. Given his short employment tenure at NationsBank, the troubles he encountered from the start, his deficient performance, and appalling conduct, no rational trier of fact could conclude that his termination raised a reasonable inference of unlawful discrimination. <u>See Ennis</u>, 53 F.3d at 62 (holding that because evidence of plaintiff's deficient performance was so pervasive, no rational trier of fact could conclude that her discharge occurred under circumstances giving rise to an inference of discrimination).

36

B.

Even assuming that Runnebaum established a prima facie case of discrimination under the ADA, I conclude that NationsBank articulated legitimate, nondiscriminatory reasons for his discharge, and Runnebaum failed to prove that those reasons were pretextual. The district court therefore properly granted summary judgment in favor of NationsBank. See Hicks, 113 S. Ct. at 2572. NationsBank terminated Runnebaum for failure to fulfill his sales goals and for failure to amend his unprofessional conduct. As the majority recognizes, see ante at 12, these are legitimate, nondiscriminatory reasons to discharge Runnebaum. See Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 330 (3d Cir. 1995); Nitschke v. McDonnell Douglas Corp., 68 F.3d 249, 250-52 (8th Cir. 1995); Ray v. Tandem Computers, Inc., 63 F.3d 429, 433 (5th Cir. 1995). The majority concludes, however, that Runnebaum proffered sufficient evidence to prove that NationsBank's rationale for terminating him was pretextual. In support of this conclusion, the majority implicitly recognizes the weakness of its argument by stating that no single fact proves Runnebaum's case, but relies on the combination of three considerations to bolster its holding: (1) the timing of Runnebaum's discharge; (2) Brown's reaction on learning of Runnebaum's seropositivity; and (3) a comparison of Runnebaum's and Andersson's sales goals. Again, none of these considerations, singly or collectively, evinces pretext.

1.

First, the majority opines that the timing of Runnebaum's discharge "raises a sufficient question of pretext," ante at 15. According to the majority, this inference is raised because Runnebaum was given additional responsibilities early in his tenure, a NationsBank employee opened his AZT, and Pettit wrote the December 9, 1992 note, but then surprisingly, Runnebaum was discharged when Pettit learned that he was HIV-positive. Concluding that these events create a disputed issue regarding Pettit's motivation in terminating Runnebaum, the majority reverses the district court's grant of summary judgment in favor of NationsBank.

I am unpersuaded by this conclusion. I agree that the timing of the discharge is important, but here, the majority focuses heavily on the

37

March Memorandum, failing to consider Runnebaum's deficient performance from March until he was discharged. See Ennis, 53 F.3d at 61 (noting that plaintiff's initial good performances were not material because her performance consistently eroded to the point of being unsatisfactory). Since inception, NationsBank observed Runnebaum's deficient performance and saw it deteriorate, culminating in the January 7, 1993 memorandum memorializing the reasons for his termination. Runnebaum had a consistent history of deteriorating performance, and in view of this, the majority is incorrect in stating that NationsBank's attitude changed "so suddenly." There was nothing "sudden" about NationsBank's action; it was gradual and culminated in Runnebaum's termination. Regarding Pettit's knowledge of Runnebaum's seropositivity and her December 9, 1992 note, I have explained why these instances are immaterial to this appeal. Accordingly, the timing and circumstances surrounding the discharge demonstrate no pretext.

2.

Second, the majority concludes that Brown's reaction on learning of Runnebaum's seropositive status "could also lend support for a finding of pretext and discrimination," ante at 17 (emphasis added). There are several flaws in relying on this reaction to prove pretext. Initially, that a conclusion could be true is insufficient for purposes of overcoming a properly supported motion for summary judgment because we have consistently eschewed building inferences in order to defeat summary judgment. See, e.g., Harleysville Mut. Ins. v. Packer, 60 F.3d 1116, 1120 (4th Cir. 1995); Ennis, 53 F.3d at 62; Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511-12 (4th Cir.), cert. denied, 115 S. Ct. 666 (1994); Beale , 752 F.2d at 214. This contention is further foreclosed because NationsBank employs individuals who are HIV-positive (assuming this is a disability) and has taken pains to accommodate those employees who need accommodations. Additionally, as demonstrated, consideration of the entirety of Brown's testimony establishes that his reaction was not pejorative. Brown never implied that Runnebaum should be terminated based on his HIV-positive status; indeed, the record belies anything but benign motivations respecting Brown: He considered himself Runnebaum's "protector," was the sole recipient of Runnebaum's revelation, helped Runnebaum procure AZT, advised Runnebaum to amend his conduct,

and informed Pettit of Runnebaum's seropositivity upon learning of her decision to execute the discharge. Also, no one else at Nations-Bank knew that Runnebaum was HIV-positive. Even disregarding these insurmountable hurdles, I am not persuaded that pregnancy cases are germane for comparing asymptomatic seropositivity to the AIDS virus -- apparently, neither is the majority because it fails to supply reasoning or authority for applying the Pregnancy Discrimination Act of 1978 to ADA claims.

3.

Third, the majority relies on ostensibly comparative evidence to conclude that Runnebaum produced sufficient evidence for a jury to conclude that NationsBank's articulated reasons for terminating Runnebaum are pretextual. To support this conclusion, the majority opines that because "Runnebaum outsold Andersson . . . but Andersson was not fired," ante at 19, an inference of pretext can be drawn because Andersson was not disabled and remained employed, despite his seemingly inferior sales performance. The pitfalls of divining any valid inferences from a comparison between Runnebaum and Andersson are manifold. As an initial matter, Runnebaum was not terminated exclusively because he failed to meet sales goals; he was also terminated for absenteeism, tardiness, and improper conduct, and there is no evidence that Andersson exhibited similar shortcomings. Comparing Andersson and Runnebaum, therefore, is improper. See Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 777 (8th Cir. 1995) (holding that to prove racial discrimination based on comparisons of other employees, the compared employees must be similarly situated in all relevant respects); Smith v. Stratus Computers , 40 F.3d 11, 17 (1st Cir. 1994) (stating in a disparate treatment case that the colleagues to whom the plaintiff compares herself must be similar to the plaintiff in every material respect and because the plaintiff could not demonstrate the same flaws in her comparators, she could not prove pretext), cert. denied, 115 S. Ct. 1958 (1995); Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (holding that before employees can be viewed as comparable for purposes of invidious discrimination, they must have the same standards, same supervisors, and engage in the same conduct). Thus, Runnebaum's reliance on a comparison of his own sales performance to Andersson's cannot prove pretext because it fails to respond to NationsBank's contention that Runnebaum was

fired for reasons other than just his sales performance. See Nitschke, 68 F.3d at 252 (stating that statistical evidence demonstrating age discrimination was immaterial for purposes of proving pretext because the employer's articulated reason for the discharge was that plaintiff was less competent than other employees); Anderson, 965 F.2d at 403 (explaining that unless a discrimination plaintiff challenges specific reasons for his discharge, he cannot prove pretext and holding that ability to meet deadlines and produce written work does not vitiate the fact that plaintiff was discharged for failure to relate well to subordinates and follow superiors' suggestions for improvement and thus affirming a grant of summary judgment). In addition, Andersson worked in Washington, D.C., while Runnebaum worked in Baltimore, and there is no evidence that these two markets are similar. Cf. Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308 (1977) (holding that the proper comparison for a claim of racial discrimination in teaching positions must be between the school's actual teaching staff and the racial composition of qualified public school teachers in the relevant market). Therefore, even assuming Runnebaum could establish a prima facie case, I would hold that NationsBank articulated legitimate, lawful reasons for his discharge that Runnebaum cannot prove were pretextual.

III.

In Conkwright v. Westinghouse Electric Corp., 933 F.2d 231, 239 (4th Cir. 1991), we concluded that to prevail on a§ 510 ERISA claim, a plaintiff may resort to the proof scheme articulated by McDonnell Douglas. As goes Runnebaum's ADA claim, so goes his ERISA claim. For the same reasons, Runnebaum cannot establish a prima facie case under the ADA, he cannot establish a prima facie case under § 510, nor, were the inquiry to proceed so far, can he prove pretext. Accordingly, I would affirm the grant of summary judgment in favor of NationsBank on Runnebaum's § 510 ERISA claim.

IV.

I conclude that the district court properly granted summary judgment in favor of NationsBank and thus would affirm. My colleagues, however, despite the wake of contrary authority, have concluded that Runnebaum established a prima facie case of discrimination and fore-

40

cast sufficient evidence to prove pretext. The evidence supports neither position. This case implicates broad ramifications respecting procedural principles, substantive discrimination law, and the force of precedent, and in my opinion, represents a sharp departure from established precepts in all of these respects. Because the majority opinion cannot be reconciled or harmonized with the undisputed, material facts or the established law, I dissent.

41